UNITED STATES of America, Appellee,

v.

Everett W. THOMPSON, Jr.,
Defendant–Appellant.

No. 589, Docket 95–1048.

United States Court of Appeals,
Second Circuit.

Argued Nov. 9, 1995.

Decided Jan. 29, 1996.

Thomas M. Gannon, Department of Justice, Washington, DC (Thomas J. Maroney, United States Attorney for the Northern District of New York, Edward R. Broton, Assistant United States Attorney, Syracuse, New York, on the brief), for Appellee.

Raymond M. Schlather, Ithaca, New York (Lopinto, Schlather, Solomon & Salk, on the brief), for Defendant–Appellant.

Before: KEARSE and WINTER, Circuit Judges, and POLLACK, District Judge *.

KEARSE, Circuit Judge:

Defendant Everett W. Thompson, Jr., appeals from a judgment of the United States District Court for the Northern District of New York, Frederick J. Scullin, Jr., *Judge,* convicting him of conspiracy to distribute and to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988), conspiracy to defraud the United States in connection with nonpayment of income taxes, in violation of 18 U.S.C. § 371 (1988), and witness tampering, in violation of 18 U.S.C. § 1512(b)(1) (1988), and sentencing him principally to 51 months' imprisonment to be followed by three years' supervised release. On appeal, Thompson contends chiefly that he is entitled to a new trial on the ground that jurors were allowed to question the witnesses. He also challenges the constitutionality of § 1512, the trial judge's refusal to recuse himself, the procedures used during jury selection, one aspect of the jury charge, and the calculation of his sentence under the federal Sentencing Guidelines ("Guidelines"). Finding no basis for reversal, we affirm the judgment.

## I. BACKGROUND

The present prosecution focused on drug distribution activities in the area of Moravia, New York, principally from 1987 to 1993, in

---

* Honorable Milton Pollack, Judge of the United States District Court for the Southern District of New York, sitting by designation.

which Charles Bergerstock was the leader and Thompson was a participant. The evidence at trial included tape recorded conversations; drug transaction records seized from Bergerstock; and testimony from a number of witnesses, including coconspirators Will Henry ("Will"), his brother Tim Henry ("Tim"), James Spano, and Martin Dann. Taken in the light most favorable to the government, the evidence as to the narcotics conspiracy and Thompson's participation in it included the following.

## A. *The Narcotics Distribution Conspiracy*

Bergerstock, the owner of garages and residences at Stauber Road and Sayles Corners Road in or near Moravia, was a major source of supply for marijuana in the Moravia area from the late 1980s to 1993. Bergerstock obtained bulk quantities of marijuana from the southwestern United States, periodically sending Will, and on one occasion Dann, to act as courier. Bergerstock normally stored the marijuana—sometimes as much as 100 pounds—in a back room or shed in his garage, or in cars parked there, and he distributed from these locations.

Bergerstock sold marijuana to Thompson, Will, Tim, Dann, Spano, Garry Stone, Kenneth J. Alvord, and others. Bergerstock's prices ranged from $1,500 to $2,600 a pound. During the period in question, Spano and Stone jointly bought about 75 pounds per year from Bergerstock. Dann too bought large quantities from Bergerstock, generally on credit; his balance normally averaged $10,000. Will, Tim, and certain others were sellers and users of narcotics; they purchased from Bergerstock in smaller quantities.

For approximately a year and a half beginning in 1988, Will worked in Bergerstock's Stauber Road garage as a mechanic. He also helped Bergerstock package the marijuana in one-pound bags. During that period, Will observed Thompson visit about once a week. On those visits, Thompson normally arrived empty-handed, went into the shed with Bergerstock, and emerged carrying a brown paper bag or box. During the same period, Tim was a part-time mechanic at that garage and observed some of Thompson's visits to the shed and his emergence with a brown paper bag. That what Thompson took away with him on those occasions was marijuana was inferable from the facts that, *inter alia,* Bergerstock kept much of his marijuana stored in the shed; Will overheard Thompson discussing with Bergerstock "how many pounds" Thompson could get; on some 10 occasions Will was in the shed with Thompson and Bergerstock while marijuana was weighed by Bergerstock and evaluated by Thompson; Bergerstock usually packaged the marijuana he sold in bags of the same type that Thompson carried away with him; and on one occasion, when the door to the shed had been left open, Tim saw Bergerstock weigh and transfer marijuana into the bag that Thompson took.

In early 1990, Bergerstock moved his operation from Stauber Road to Sayles Corners Road. At the new location, Will spent less time as a mechanic and more as Bergerstock's assistant in the drug business. He frequently made trips to bring marijuana back from New Mexico; he helped weigh and package the marijuana that was brought back; he made marijuana deliveries to Bergerstock's customers; and he stored some of Bergerstock's marijuana at his home. In 1990 and 1991, Will observed Thompson visit the Sayles Corners Road garage about twice a week. On those visits, Thompson and Bergerstock would go into the back room and weigh out pounds of marijuana which Thompson purchased. Will was with them in the back room on several such occasions. Three times in 1990, Will delivered five pounds of marijuana to Thompson. On another occasion, Thompson was sent to Will's home by Bergerstock to obtain 12 pounds of the marijuana stored there.

Will also observed Thompson make payments of thousands of dollars to Bergerstock and on one occasion heard Bergerstock threaten to stop selling marijuana to Thompson unless he paid a debt of $4,000. Tim too heard discussions of debts owed to Bergerstock by Thompson ($3,500) and Dann ($8,000). Thompson was listed as a debtor many times in Bergerstock's drug transaction records.

Dann testified that on several occasions at Bergerstock's Sayles Corners Road garage from 1990 to 1992, he saw Thompson obtaining marijuana in quantities of up to two pounds. On numerous occasions, Thompson, Dann, and Bergerstock met in the back room of the garage and discussed marijuana quality, inventory level, the scheduling of new shipments, and price.

Bergerstock was apparently close-mouthed about the prices he charged various customers. Will, though often present for the weighing of the marijuana to be purchased by Thompson, normally was sent from the room before price was discussed. Will once asked Thompson how much he was paying Bergerstock for marijuana, but Thompson smiled and said nothing. On a few occasions, Dann and Thompson discussed their dealings with Bergerstock and tried to calculate which of them was paying more for the marijuana.

Thompson resold marijuana he bought from Bergerstock, and some of Thompson's customers testified at trial. Rodney Leonard testified that he had bought about 10 pounds of marijuana from Thompson during a 15–month period from late 1991 through early 1993. Leonard began by purchasing small quantities, but he later purchased one- and two-pound quantities and was aware that Thompson distributed larger quantities. Leonard once saw four pounds of marijuana in Thompson's bedroom; on another occasion, Thompson said that on the previous day he had sold 10 pounds.

Other customers of Thompson included William Wade, who testified that from 1985 to 1992 he had bought marijuana from Thompson, usually in quarter-ounce quantities, some 20 times. Jeff Dean testified that from 1990 to 1992, he had bought marijuana from Thompson on 20 to 25 occasions. He usually bought quarter-pound quantities, though six or seven times he made one-pound purchases.

B. *The Present Prosecution*

In the summer of 1993, when Thompson and others had become aware that a federal investigation was underway with respect to the Bergerstock narcotics operation, Thompson had conversations about the investigation with Wade, Will, Tim, Leonard, and Dann. Wade testified at trial that Thompson came to his house unannounced on the morning Wade was to testify before the grand jury. Thompson told Wade "not to say anything different that didn't take place." And though Wade had purchased marijuana from Thompson some 20 times, Thompson told him "just to tell them [Wade] purchased marijuana a couple of times from him and that was it, just don't tell them anything else other than that."

After Bergerstock was arrested, Thompson told Will that if Will did not talk about Thompson, Thompson would not talk about Will. He offered a similar agreement to Dann and told Tim that if Bergerstock's connections "stuck together" and did not "rat each other out" they would "get through this." Thompson advised Leonard not to make a deal with the prosecution. Thompson also influenced Will to sign an affidavit repudiating statements Will had previously made to law enforcement officials with regard to the scope of the drug conspiracy.

Eventually, Thompson, Bergerstock, and others were indicted. A superseding indictment handed down in February 1994 alleged that Thompson, Bergerstock, Alvord, Will, and Tim had, *inter alia*, conspired to distribute narcotics, in violation of 21 U.S.C. § 846 (count one), and that, with the exception of Tim, they had conspired to evade taxes on their narcotics-distribution income, in violation of 18 U.S.C. § 371 (count seven). Bergerstock, Alvord, Will, and Tim pleaded guilty to various offenses; other coconspirators pleaded guilty in related cases.

Thompson stood trial alone on the two conspiracy counts and on a third count alleging witness tampering with respect to Wade, in violation of 18 U.S.C. § 1512(b). Thompson was found guilty on all three counts and was sentenced as indicated above.

## II. DISCUSSION

On appeal, Thompson contends principally that he is entitled to a new trial on the ground that jurors were allowed to question the witnesses. His other challenges to his conviction include his contentions that the

district judge should have recused himself; that the court's procedure for the exercise of peremptory challenges was improper; that 18 U.S.C. § 1512, both facially and as applied, is unconstitutional; and that the court failed to instruct the jury properly with regard to multiple conspiracies. He also challenges his sentence. For the reasons below, we find no basis for relief.

A. *Juror Questioning of Witnesses*

At the start of the trial, the court informed the jurors that they would be allowed to ask questions with respect to each witness's testimony. The questions were to be submitted in writing to the judge, who would relay them to the witness if he felt the questions were appropriate. The court stated that questions were to be posed only for clarification, and that the jurors were not to play advocate:

> Now, after a witness is through testifying, I am going to allow you, the Jury, to submit questions in writing to me, if you have any questions of that witness....
>
> If you have a question,.... write it down, I will review it and if I feel it is appropriate, I will ask the question for you.
>
> There are times, though, when I will not be able to ask a question or ask it in the form that you put it. I will rephrase it or not ask it at all, because of the various rules of evidence that have to be applied. Don't feel intimidated by that. If you feel there is a question you need to ask, write it down and I will decide whether I can ask it or not.
>
> Keep in mind the purpose of asking questions is for clarification's sake. If you don't understand some of the evidence going in or you're unclear as to what it means or something of this nature, then you may want to ask questions for clarification.
>
> You are not advocates and you are not to ask questions as an advocate, that sort of thing, so don't get involved with that sort of thing. If you have some legitimate questions as to what the evidence means, what the witness is saying, testifying to,

then please feel free to write the questions down.

(Trial Transcript ("Tr.") 192–93.) Throughout the trial, before each witness was allowed to step down, the court inquired whether any juror had any questions for the witness. This procedure was followed despite objection by Thompson.

On appeal, Thompson contends, relying on our recent decision in *United States v. Ajmal* ("*Ajmal*"), 67 F.3d 12 (2d Cir.1995), that the court's adoption of this procedure entitles him to a new trial. Although we disapprove of the court's invitation of juror questioning, we conclude that the error was harmless.

■ As a general rule, the allowance of juror-originated questioning of witnesses lies within the trial court's discretion, *see, e.g.,* *United States v. Bush,* 47 F.3d 511, 515 (2d Cir.1995); *United States v. Witt,* 215 F.2d 580, 584 (2d Cir.), *cert. denied,* 348 U.S. 887, 75 S.Ct. 207, 99 L.Ed. 697 (1954), but we have strongly discouraged the practice except in extraordinary or compelling circumstances, because such questioning tends to impair juror neutrality during the trial and to encourage premature deliberations:

> Although we reaffirm our earlier holding in *Witt* that juror questioning of witnesses lies within the trial judge's discretion, we strongly discourage its use. The most troubling concern is that the practice risks turning jurors into advocates, compromising their neutrality.... It is difficult for jurors to be both active participants in the adversarial process, embroiled in the questioning of witnesses, and detached observers, passing on the credibility of the witnesses and the plausibility of the facts presented....
>
> If, perchance, jurors pose questions that are less inquiries and more commentary, they further impair their neutrality. The appropriate occasion for jurors to express skepticism is during deliberations, not during the trial. And the appropriate time to start deliberations is after the jury has heard all the evidence, the arguments of counsel and the judge's charge on the law. At the very least, jury questioning is a

subliminal invitation to launch prematurely into evaluating the evidence.

*United States v. Bush,* 47 F.3d at 515.

In *Bush,* the juror questions had been spontaneous and the defendant had not objected. We rejected Bush's contention that the direct questioning of witnesses by the jurors constituted *per se* reversible error. Noting that the court had carefully confined the process, and that "only limited questioning" had occurred, 47 F.3d at 514, we concluded that there had been no abuse of discretion and that Bush had not shown plain error because he could not show that the process caused him prejudice, *see id.* at 512, 514, 516.

*Ajmal,* on which Thompson relies, differed from *Bush* both in the scope and nature of the questioning and in the origin of the questioning process. In *Ajmal,* Judge Scullin invited the jurors at the outset of the trial to pose questions for the witnesses, and he reissued the invitation as each witness finished testifying. We noted that the case involved a "banal drug conspiracy" without any particular intricacy or any exceptional circumstances warranting questions from the jurors, and we concluded that the court's routine and repeated invitation of such questions was an abuse of discretion. 67 F.3d at 14. Further, the *Ajmal* jurors

> took extensive advantage of the opportunity to ask questions of the witnesses, including questioning Ajmal himself. Despite the objection of Ajmal's attorney, the district court allowed the jurors to continue questioning witnesses throughout the trial as a matter of course,

*id.* at 13, and some of their questions had no apparent fact-clarifying thrust. We concluded that despite the court's use of some prophylactic measures to screen the questions, the fact that the jurors took "extensive advantage of this opportunity to question witnesses, including Ajmal[,].... tainted the trial process by promoting premature deliberation, allowing jurors to express positions through non-fact-clarifying questions, and altering the role of the jury from neutral factfinder to inquisitor and advocate." *Id.* at 15. In the circumstances, we concluded that Ajmal was entitled to a new trial. *See id.*

In the present case, as in *Ajmal,* the questioning process was invited by the court as an apparently routine practice. The invitation was extended at the outset of the trial and was repeated as each witness was about to leave the stand. Though there may have been a more extensive conspiracy here than was apparent in *Ajmal,* the need for juror questioning is not evident, and we conclude that such questioning should not have been invited or repeatedly encouraged.

■ As indicated by our affirmance in *Bush,* however, the court's allowing juror questioning is not a *per se* basis for a new trial. There are of course some trial errors that automatically warrant relief because "the structural protections of the [proceedings] have been so compromised as to render [them] fundamentally unfair," as when "[t]he nature of the violation allow[s] a presumption that the defendant was prejudiced, and any inquiry into harmless error would ... require[ ] unguided speculation." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 256–57, 108 S.Ct. 2369, 2374–75, 101 L.Ed.2d 228 (1988). Juror-originated questioning, however, is not such an error. The jury's truth-seeking function may well require that some juror-originated questions be permitted. This potential need underlies the prevailing principle that whether or not to allow such questions is a matter committed to the sound discretion of the trial court. Though the truth-seeking function must be weighed against the concern for jury neutrality until after the jury has heard all the evidence, the summations, and the court's instructions on the law, the truth-seeking function precludes characterization of even improper juror-originated questioning as an error that is "structural." Accordingly, we consider whether the court's encouragement of such questioning in the present case constituted harmless error. *See* Fed.R.Crim.P. 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.") That is, we consider whether there is a "fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."

*Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

We conclude that the error was harmless. Unlike the jurors in *Ajmal,* the jurors here did not propose a significant number of questions, and the questions relayed seem to have been directed, properly, at clarification rather than advocacy or speculation. A total of some 30 witnesses testified during Thompson's 11–day trial; juror questions were directed to only three witnesses, and the court actually relayed questions to only two. In all, just 14 questions were relayed to the two witnesses, focusing on six discrete matters. Thompson did not testify, and hence no questions were directed toward him.

Further, we have reviewed all of the juror questions, both those that were relayed to the witnesses and those that were not. Those relayed plainly appear to have been aimed at clarification of testimony rather than at speculation or argument. Though there were a few additional questions that appeared oriented toward speculation, the court did not pose those questions to the witness, and presumably the thoughts contained in those questions were not aired until deliberations had begun. In all the circumstances of the present case, we conclude that the trial court's invitation of juror questioning was harmless error.

### B. *Other Challenges to the Conviction*

Thompson's other challenges are without merit.

#### 1. *Recusal*

Prior to trial, Thompson, along with other defendants who had not yet pleaded guilty, moved to disqualify Judge Scullin pursuant to 28 U.S.C. § 455 (1994). The ground of the motion was that in March 1991, while attempting to transport marijuana from the southwestern United States to New York for Bergerstock, Will was arrested by the United States Drug Enforcement Administration ("DEA") in Chicago, Illinois; at that time Judge Scullin was the United States Attorney for the Northern District of New York ("NDNY"), and defendants theorized that Judge Scullin might have been informed of or involved in the investigation.

In opposition to the recusal motion, the government represented that the NDNY United States Attorney's office's investigation into the Bergerstock conspiracy did not begin until December 1992, and it presented evidence that the earliest indication of any awareness by the DEA's NDNY office with respect to the Bergerstock operation was July 1992. The DEA case agent stated that the NDNY DEA office was not advised of Will's Chicago arrest until the fall of 1992 and did not begin its official investigation until November 1992. Judge Scullin, who had been United States Attorney only until March 1992, denied the recusal motion, stating that during the time he held that position he had no knowledge of these matters.

Thompson pursues his recusal quest on appeal, arguing that "[i]f the investigation leading directly to the indictment [in this case] began while the judge was still in the United States Attorney's office, the judge should disqualify himself." (Thompson brief on appeal at 22.) We conclude that the record provides no basis for reversal.

■ A federal judge is required to disqualify himself "in any proceeding in which his impartiality might reasonably be questioned," 28 U.S.C. § 455(a), or in any matter "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy," 28 U.S.C. § 455(b)(3). A judge who has served as United States Attorney is not considered "counsel" with respect to a criminal case if the investigation that led to the indictment began after he left the office of United States Attorney. *See, e.g., United States v. DeLuna,* 763 F.2d 897, 908 (8th Cir.), *cert. denied,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985); *Barry v. United States,* 528 F.2d 1094, 1098–99 (7th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 81, 50 L.Ed.2d 88 (1976); *In re Grand Jury Investigation,* 486 F.2d 1013, 1015–16 & n. 3 (3d Cir.1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974). Nor is disqualification required merely because some part of the offense was committed

while the judge was the United States Attorney, if he left that position before that office's investigation of the offense began. *See, e.g., United States v. Kelly,* 556 F.2d 257, 263 (5th Cir.1977), *cert. denied,* 434 U.S. 1017, 98 S.Ct. 737, 54 L.Ed.2d 763 (1978).

■ The ultimate inquiry under § 455(a) is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992). Disqualification is not required on the basis of "remote, contingent, indirect or speculative interests." *Id.* The judge's denial of a recusal motion is reviewed for abuse of discretion. *See, e.g., id.*

We see no abuse of discretion here. Judge Scullin, who left the United States Attorney's office in March 1992, stated that he had no knowledge of any investigation related to the present case while he was in that office. The government presented evidence that no such investigation was begun in the NDNY by either the DEA or the United States Attorney's office until several months after Judge Scullin had left that office. Thompson has pointed to no contrary evidence. The recusal motion was properly denied.

### 2. *Peremptory Challenges*

In a prosecution for a noncapital felony, a defendant is entitled to 10 peremptory challenges and the government is entitled to six. *See* Fed.R.Crim.P. 24(b). In the present case, the district court informed the parties that the "jury-box" selection system, which is the traditional method of jury selection, *see generally United States v. Severino,* 800 F.2d 42, 47–48 (2d Cir.1986), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987), would be used; that the selection process would consist of three rounds; and that a certain number of peremptory challenges must be used in each round or they would be deemed waived. The government was allotted three challenges for the first round, two for the second, and one for the third. Thompson was allotted five challenges for the first round, four for the second, and one for the third. He contends that the limita-tions placed on him were improper. We disagree.

■ Peremptory challenges are a "means to the constitutional end of an impartial jury and a fair trial." *Georgia v. McCollum,* 505 U.S. 42, 57, 112 S.Ct. 2348, 2358, 120 L.Ed.2d 33 (1992). Nonetheless, such challenges are not constitutional rights, *see id.,* and "trial courts retain a broad discretion to determine the way peremptory challenges will be exercised," *United States v. Severino,* 800 F.2d at 48 (internal quotation marks omitted); *United States v. Blouin,* 666 F.2d 796, 797 (2d Cir.1981).

■ The jury-box system begins with an array equaling the size of the ultimate jury, and prospective jurors who are dismissed from the array are replaced by new prospective jurors. *See id.* at 796. In regulating the parties' use of their peremptories, the court must afford a reasonable opportunity to challenge not only those persons originally seated but also a reasonable number of the replacements. *See id.* at 799. Thus, we have noted that the jury-box system should not be administered in such a way as to force a defendant "to use all of his allotted challenges against a panel that include[s] only half of the eventual members of his jury." *Id.* at 800. We have held, however, that the use of a procedure that results in the defendant's being required to use his last peremptory challenge without knowing the identities of two members of the jury is not an abuse of discretion. *See, e.g., id.* at 799; *United States v. Keegan,* 141 F.2d 248, 254–55 (2d Cir.1944), *rev'd on other grounds,* 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745 (1945).

The procedure used in the present case adequately protected Thompson's rights. Thompson was not required to use all or most of his peremptories in the first round, nor was he required to use all of them in the first and second rounds combined. Further, as it happened, six prospective jurors were replaced on the first round, five were replaced on the second round, and one was replaced on the third round. Thus, in the second round, there were six new prospective jurors, and Thompson had four challenges that he could use. Plainly there is no requirement that a defendant have as many

remaining peremptories as there are new prospective jurors; he has only 10 at the outset for a 12–person array. And given that there was only one replacement in the third round after Thompson exercised his last peremptory, Thompson had the opportunity to consider 11 of the 12 jurors before exercising his last peremptory challenge. We conclude that the procedure adopted by the court was not an abuse of discretion.

### 3. The Constitutionality of § 1512

Section 1512(b) of Title 18 provides, in pertinent part, that

[w]hoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding

is guilty of a felony. 18 U.S.C. § 1512(b)(1). Subsection (d) of § 1512 provides that

[i]n a prosecution for an offense under [§ 1512], it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

18 U.S.C. § 1512(d). Thompson contends that § 1512 violated his First Amendment rights by broadly "proscrib[ing] persuasion" and violated his due process rights by shifting the burden of proof to him, "compel[ling] him] to prove the lack of corruption." (Thompson brief on appeal at 28.) He also contends that the section is impermissibly vague. These contentions are meritless.

Section 1512(b) does not prohibit all persuasion but only that which is "corrupt[ ]." The inclusion of the qualifying term "corrupt[ ]" means that the government must prove that the defendant's attempts to persuade were motivated by an improper purpose. Cf. United States v. Fasolino, 586 F.2d 939, 941 (2d Cir.1978) (construing parallel provision in 18 U.S.C. § 1503 (1976), which applied to any person who, inter alia, "corruptly, or by threats or force, or by any threatening letter or communication, endeav-

or[ed] to influence, intimidate, or impede" any grand or petit juror, witness, or court officer); see also United States v. Rasheed, 663 F.2d 843, 852 (9th Cir.1981) ("corruptly" in 18 U.S.C. § 1503 (1976) required that act in question "be done with the purpose of obstructing justice"), cert. denied, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982). A prohibition against corrupt acts "is clearly limited to . . . constitutionally unprotected and purportedly illicit activity." United States v. Jeter, 775 F.2d 670, 679 (6th Cir. 1985) (construing 18 U.S.C. § 1503 (1982)), cert. denied, 475 U.S. 1142, 106 S.Ct. 1796, 90 L.Ed.2d 341 (1986). By targeting only such persuasion as is "corrupt[ ]," § 1512(b) does not proscribe lawful or constitutionally protected speech and is not overbroad.

Nor is § 1512(b) unduly vague. A criminal statute must of course "define the . . . offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983), and laws impinging on speech must pass a more stringent test in this respect than other laws, see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). A scienter requirement, however, may suffice to provide adequate notice that given conduct is proscribed. See id. & n. 14. Section 1512(b) includes such a scienter requirement by proscribing only such persuasion as is "corrupt[ ]." As indicated above, we have interpreted the term "corruptly," as it appears in § 1503, to mean motivated by an improper purpose. See United States v. Fasolino, 586 F.2d at 941. We interpret § 1512(b)'s use of that term in the same way, and, as thus interpreted, the section is not impermissibly vague.

The trial court's instructions to the jury in the present case were consistent with this interpretation:

To sustain its burden of proof for the crime of tampering with a witness as charged in Count III, the Government must prove beyond a reasonable doubt the following two essential elements:

First, that the Defendant Everett W. Thompson, Jr., knowingly, corruptly persuaded or attempted to corruptly persuade William Wade, the person identified in Count III as a witness; and

Second, that the Defendant Everett W. Thompson, Jr., did so intending to influence the testimony of William Wade at the Grand Jury proceeding.

The first element the Government must prove beyond a reasonable doubt is that the Defendant corruptly persuaded or attempted to corruptly persuade William Wade.

To act "corruptly["] as that word is used in these instructions means to act deliberately for the purpose of improperly influencing, or obstructing, or interfering with the administration of justice.

(Tr. 1615–16.) Plainly, the evidence was sufficient to permit the jury to convict Thompson in compliance with these instructions. Wade testified that he had made some 20 purchases of marijuana from Thompson, and that Thompson told him "[b]asically, just to tell [the grand jury] I purchased marijuana a couple of times from him and that was it, just don't tell them anything else other than that." Given Thompson's knowledge of the grand jury investigation, his efforts to cause many of the other coconspirators to conceal relevant information from the federal investigators, and the falsity of the statement that Thompson urged Wade to make, the jury could properly find that Thompson's communications to Wade were motivated by an improper purpose.

Finally, we reject Thompson's contention that § 1512(d)'s provision for an affirmative defense has the effect of shifting the burden of proof to the defendant. We considered such a challenge in *United States v. Johnson*, 968 F.2d 208, 214 (2d Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 436, 121 L.Ed.2d 355 (1992), a prosecution under § 1512(b) for use of threats and intimidation with intent to cause witnesses to withhold testimony from an official proceeding, and we concluded, that § 1512(d) does not place an unconstitutional burden on the defendant:

True, the elements of the crime and of the affirmative defense overlap, "in the sense that evidence to prove the latter will often tend to negate the former," *Martin v. Ohio*, 480 U.S. [228, 234, 107 S.Ct. 1098, 1102, 94 L.Ed.2d 267 (1987)], but this overlap did not shift to Johnson the burden of proof on any element of the crime of witness tampering, nor did it allow the jury to presume elements of the government's case.

968 F.2d at 214.

Thompson has given us no reason to reach a different conclusion here. Though the overlap between the elements of the offense and the affirmative defense makes it imperative for the trial court to give the jury clear instructions that the government retains the burden of proving beyond a reasonable doubt all of the elements of the offense, the above excerpt from the instructions given in the present case makes it plain that the trial court here did precisely that.

### 4. *The Requested Multiple–Conspiracy Charge*

At trial, Thompson took the position that there was one "seller[s']" conspiracy among Bergerstock, Will, Tim, and others; that there was another conspiracy among those who transported the marijuana from the southwest to Moravia; and that Thompson was not a member of either. He maintained that he was a small-time user/dealer who simply bought marijuana from Bergerstock and was not involved in Bergerstock's overall activities. He asked the trial court to instruct the jury, *inter alia*, that the government was required to "show that the single master conspiracy alleged in Count 1 existed. Proof of separate agreements or independent conspiracies is not sufficient"; that in order to find a single conspiracy, the jury must find that "common, master, or overall goals or objectives existed which served as the focal point for the efforts and actions of any members to the agreement"; and that the jury should conclude instead that multiple conspiracies existed if it found "separate agreements ... without controlling overall goals on [*sic* ] objectives which are shared by all the individuals." (Defendant's Requested Jury Instructions.) On appeal Thompson does not contend that there was any error in

the instructions given by the court, but he contends that the failure to give his requested charge was error. We disagree.

 In order to prevail on a contention that the trial court erred in refusing to give requested instructions, an appellant must establish that his own requested charge "'accurately represented the law in every respect,'" and that the charge actually given, viewed as a whole, prejudiced him. *United States v. Dove*, 916 F.2d 41, 45 (2d Cir.1990) (quoting *United States v. Ouimette*, 798 F.2d 47, 49 (2d Cir.1986), *cert. denied*, 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988)). In order to obtain a reversal on the ground that the court failed to give a requested multiple-conspiracy charge, a defendant must show, *inter alia*, evidence of separate networks operating independently of each other. *See, e.g., United States v. Maldonado–Rivera* ("*Maldonado–Rivera*"), 922 F.2d 934, 962–63 (2d Cir.1990), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Barlin*, 686 F.2d 81, 89 (2d Cir. 1982). The trial court's failure to give a requested multiple-conspiracy charge, even one that is entirely correct, does not result in prejudice where the evidence was sufficient to permit the jury to find beyond any reasonable doubt that the defendant was a member of the single conspiracy alleged, *see, e.g., Maldonado–Rivera*, 922 F.2d at 964.

 In the present case, the charge requested by Thompson was flawed in two respects. First, the proposed charge's suggestion that the jury should acquit if it found that there were not "controlling overall goals on [*sic*] objectives which are shared by all the individuals" was contrary to the principle that the participants' goals need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes. *See, e.g., Maldonado–Rivera*, 922 F.2d at 963; *United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1192 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Heinemann*, 801 F.2d 86, 92 n. 1 (2d Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).

Second, even if multiple conspiracies are found, the jury should convict the defendant if it finds that one of the proven conspiracies is the one alleged in the indictment and that the defendant was a member of it. *See, e.g., United States v. Lam Lek Chong*, 544 F.2d 58, 68 (2d Cir.1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977); *United States v. Tramunti*, 513 F.2d 1087, 1107 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 55, 46 L.Ed.2d 50 (1975). The proposed charge obscured, rather than disclosed, this principle.

 Even had Thompson's proposed instruction been entirely correct, however, we would not be able to conclude that its omission caused him prejudice since the evidence presented by the government was ample to show a single conspiracy, with Bergerstock as its hub and Thompson and others participating as spokes. The record included evidence that Thompson purchased hundreds of pounds of marijuana from Bergerstock; that he knew of the involvement of Will, who was sometimes present when Bergerstock measured out Thompson's purchase from a vastly larger supply; and that Thompson had numerous joint discussions with Bergerstock and Dann about such matters as the quality of the marijuana Bergerstock was providing, the quantity he had on hand, and Bergerstock's expectations as to the timing of new shipments. Though Thompson may not have known the precise prices that others paid Bergerstock or the details of the transport of marijuana to New York, the evidence was sufficient to permit the jury to find beyond a reasonable doubt that he knew he was a participant in a large enterprise. That inference is enhanced by the scope of Thompson's attempts to influence the course of the federal investigation, as he spoke not only with his own customers but also with some of Bergerstock's other customers and aides, including Will, Tim, and Dann.

## C. *Sentencing Challenges*

In the presentence report ("PSR") on Thompson, the United States Probation Department recommended that the quantity of narcotics to be attributed to him be 60 to 80 kilograms (the equivalent of approximately 132.28 to 176.37 pounds), which would give

him a base offense level of 22, and that, in light of his conviction of witness tampering, his total offense level be 24. Since his criminal history category was I, the Guidelines-recommended range of imprisonment was 51–63 months. The district court sentenced Thompson to, *inter alia*, 51 months' imprisonment. On appeal, Thompson makes a number of challenges to the calculation of his sentence, none of which has merit and few of which warrant extended discussion.

### 1. The Alternative to Statutory Minimum Sentences

Thompson contends that the court should have reduced his sentence pursuant to a recent amendment to 18 U.S.C. § 3553 which provides that if a defendant meets certain criteria, "the court shall impose a sentence pursuant to [the Guidelines] without regard to any statutory minimum sentence." 18 U.S.C. § 3553(f) (1994); *see also* Guidelines § 5C1.2 (same). The criteria are, essentially, (1) that the defendant has no more than one criminal history point; (2) that "the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense"; (3) that the offense did not result in death or serious bodily injury; (4) that the defendant did not play a leadership role in the offense or engage in a continuing criminal enterprise; and (5) that prior to the sentencing proceeding the defendant has truthfully provided the government all the information he has relating to the offense. 18 U.S.C. § 3553(f). Even without reference to whether or not Thompson met these criteria, the district court found § 3553(f) inapplicable because the quantity of narcotics attributed to him did not subject him to a statutory minimum sentence, *see* 21 U.S.C. § 841(b)(1) (requiring five-year or ten-year prison terms for offenses involving certain quantities of drugs). Thompson appears to make two challenges to this ruling.

■ First, he contends that Guidelines commentary interpreting § 3553(f) limited the conspiratorial conduct for which he could properly be held accountable. The commentary to which he refers states as follows:

"Consistent with § 1B1.3 (Relevant Conduct), the term 'defendant,' as used in subdivision (2), limits the accountability of the defendant to his own conduct and conduct that he aided or abetted, counseled, commanded, induced, procured, or willfully caused." Guidelines § 5C1.2 Application Note 4. Thompson apparently contends that this interpretation relieves him of responsibility for any narcotics that he personally did not distribute. This contention is trebly frivolous. To begin with, the "subdivision" to which Application Note 4 is expressly directed is the second statutory criterion set out above, which deals only with whether a defendant used or threatened violence or possessed a dangerous weapon in connection with the offense; it does not touch upon the quantity of drugs involved in the offense. Further, even if it did purport to deal with the latter, Application Note 4 itself (a) states that a defendant is responsible for conduct that he, *inter alia*, "aided or abetted," and (b) states that the guideline is intended to be "[c]onsistent with § 1B1.3." Section 1B1.3 includes within a defendant's relevant conduct the acts of another person that were within the scope of criminal activity jointly undertaken by the defendant and the other person and were foreseeable to the defendant. *See* Guidelines § 1B1.3(a)(1)(B); *United States v. Studley*, 47 F.3d 569, 574 (2d Cir.1995). And finally, Thompson would not have been benefited by consideration of only the quantity of narcotics for which he was personally responsible because, as discussed in Part II.C.2. below, there was evidence of his own purchases of a far greater quantity of marijuana than the court actually attributed to him.

■ Second, Thompson challenges the ruling that § 3553(f) was not applicable to him because the quantity of narcotics attributed to him was below the amount that would have subjected him to a statutory minimum sentence. He argues that a statute that allows the court to reduce the sentence of a qualifying defendant who distributed a large quantity of drugs should also allow the court to grant a similar reduction to a defendant who has the same qualifications but whose relevant conduct was less culpable. The

statute does not so provide; its language is unambiguous. If the defendant meets the stated criteria, the court is to sentence him in accordance with the applicable Guidelines range "without regard to any statutory minimum sentence." 18 U.S.C. § 3553(f). Those defendants who, like Thompson, are not in any way subject to a statutory minimum sentence are not affected.

We see no ground for challenge in the fact that Congress chose not to authorize a sentencing reduction for persons less culpable. Within constitutional limits, it is the prerogative of Congress to prescribe penalties for federal crimes. Plainly, Congress could, if it wished, eliminate statutory minima altogether and have all defendants sentenced strictly in accordance with the Guidelines. Its choice to limit the applicability of statutory minimum sentences in certain cases was well within the scope of its power.

Nor do we see any disparity resulting from the operation of § 3553(f) with respect to defendants whose offenses simply involve different quantities of drugs. The statute does not authorize the court to sentence a defendant meeting the § 3553(f) criteria below the range that is prescribed by the Guidelines for one with the defendant's total offense level and criminal history category. See, e.g., United States v. Gaston, 68 F.3d 1466, 1468 (2d Cir.1995) (under § 3553(f), court is to "ignore the statutory minimum and impose sentence pursuant to the Guidelines"). Since base-offense-level calculations in narcotics cases are pegged to the quantity of drugs involved in the offense, a defendant who is responsible for a quantity of narcotics sufficient to trigger a statutory minimum will ordinarily have a higher base offense level than one who is responsible for less. To the extent that the ultimate sentence may be higher for the latter, that will be a reflection of other factors such as different criminal history categories and the commission of additional offenses, not of the operation of § 3553(f).

## 2. Other Sentencing Challenges

Thompson's other challenges to his sentence include the contentions that the court failed to make specific factual findings regarding the amount of marijuana attributable to him, improperly denied him downward adjustments for minor role pursuant to Guidelines § 3B1.2(b) and acceptance of responsibility pursuant to § 3E1.1(a), and did not sentence him in accordance with an amendment to § 2D1.1(b) which took effect after the date of sentencing. These contentions need not detain us long.

As to facts disputed in connection with sentencing, the court is required to make findings sufficient to permit appellate review. See, e.g., United States v. LaValley, 999 F.2d 663, 666 (2d Cir.1993) (minor role in the offense); United States v. Lanni, 970 F.2d 1092, 1093 (2d Cir.1992) (amount of narcotics reasonably foreseeable to a defendant convicted of conspiracy). It is sufficient for these purposes if the court indicates, either at the sentencing hearing or in the written judgment, that it is adopting the recommendations in the PSR. See, e.g., United States v. Maturo, 982 F.2d 57, 62 (2d Cir.1992), cert. denied, 508 U.S. 980, 113 S.Ct. 2982, 125 L.Ed.2d 679 (1993).

In reviewing challenges to sentencing under the Guidelines, we must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1994); see, e.g., United States v. Jacobo, 934 F.2d 411, 418 (2d Cir. 1991); United States v. Rodriguez–Gonzalez, 899 F.2d 177, 182–83 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990). Findings as to the quantity of narcotics and a defendant's role in the offense are findings of fact subject to the clearly erroneous standard of review. See, e.g., United States v. Cousineau, 929 F.2d 64, 67 (2d Cir.1991) (quantity of narcotics); United States v. Rios, 893 F.2d 479, 481 (2d Cir. 1990) (role in the offense). The sentencing court's determination that a defendant has not accepted responsibility may not be disturbed unless it is without foundation. See, e.g., id.; United States v. Bonds, 933 F.2d 152, 156 (2d Cir.1991); United States v. Tillem, 906 F.2d 814, 828 (2d Cir.1990); United States v. Irabor, 894 F.2d 554, 557 (2d Cir. 1990).

With regard to the amount of marijuana attributed to him, Thompson contends that the court "fail[ed] to make specific factual findings." (Thompson brief on appeal at 42.) We disagree. The government contended that Thompson was responsible for 100–400 kilograms of marijuana, which was the entire amount the government attributed to Bergerstock's operations. Thompson contended that the amount for which he should be held responsible was in the range of 10–20 kilograms or 40–45 pounds. The court rejected both sides' contentions and stated that, having reviewed the PSR and having presided at trial,

> [t]he Court finds that the defendant's liability [with respect to narcotics] conspiracy incorporates more than what the defense has maintained as to what he was personally liable for, bought or sold. However, the Court does not agree to the extent maintained by the government. The Court rules that the drug quantity attributable to the defendant in this case is 60 to 80 kilograms of marijuana.

(Sentencing Transcript 10.) In addition, the written judgment stated, "The court adopts the factual findings and guideline application in the presentence report." Either statement was sufficient to permit appellate review.

■ Nor is there clear error in the court's finding that Thompson should be held responsible for at least 60 kilograms (*i.e.*, at least 132.28 pounds) of marijuana, for the evidence was ample to support a finding that, for just a part of the period in question, Thompson was personally responsible for twice that amount. The record included evidence from Will that Thompson visited Stauber Road once a week for 1½ years from mid–1988 to early 1990, purchasing pounds of marijuana; the court thus could have found that Thompson purchased 78 pounds of marijuana in that period. Further, Will testified that after Bergerstock moved to the Sayles Corners Road garage in early 1990, Thompson visited that garage at least twice a week in 1990 and 1991, again dealing in pounds of marijuana. In addition, Dann testified that he had seen Thompson buy up to two-pound quantities there in the period 1990 to 1992;

Spano and Tim too testified that Thompson made purchases in 1992; Leonard testified that he bought pounds of marijuana from Thompson in 1992 and 1993. Even limiting consideration to 1990–1991, and assuming that in that period Thompson bought only an average of one pound per visit to the Sayles Corners Road garage, the court could have found that on those visits he purchased substantially more than 160 pounds of marijuana. In addition to what Thompson picked up on his visits to the garages, in 1990 Will delivered 15 pounds of Bergerstock's marijuana to Thompson, and Thompson picked up another 12 pounds from Will's residence. Thus, without even considering the evidence of Thompson's purchases and sales of many pounds of marijuana in 1992 and 1993, the evidence was easily sufficient to permit the court to find that between 1988 and the end of 1991, Thompson purchased from Bergerstock some 265 pounds of marijuana, *i.e.*, approximately 120 kilograms. Thompson has no basis for complaint in the attribution to him of 60–80 kilograms.

■ Thompson's contention that he should have been given a minor-role adjustment pursuant to Guidelines § 3B1.2(b) is frivolous. A defendant's role in the offense is to be assessed not only in light of his relationship to his associates but also in light of the elements of the offense of conviction, for it is not the intent of the Guidelines to reward a guilty defendant with such an adjustment merely because his coconspirators were even more culpable. *See, e.g., United States v. Lopez*, 937 F.2d 716, 728 (2d Cir. 1991); *United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir.1989).

Thompson was responsible for at least 132 pounds of marijuana. The record includes evidence that Bergerstock sold marijuana for $1,500–$2,600 a pound; unless Thompson always paid the bottom of that range, he would have spent more than $200,000 in his purchases. The record also showed that Thompson resold at prices ranging from $2,450 to $3,200 a pound; if his average resale price was $2,700, he received more than $350,000. Regardless of the culpability of others, and ignoring the evidence from which the court could have found Thompson responsible for

more than twice the quantity actually attributed to him, Thompson clearly was not a minor participant within the meaning of the Guidelines.

■ Thompson's contention that he was entitled to a downward adjustment pursuant to Guidelines § 3E1.1 for acceptance of responsibility is likewise frivolous. First, he had attempted to obstruct justice by urging Wade to lie to the grand jury as to the number of times Thompson sold him marijuana, urging other coconspirators to refuse to cooperate with the authorities, and urging Will to recant a truthful statement already made to the authorities. It is rare that a defendant who has attempted to obstruct justice should be given a downward adjustment for acceptance of responsibility. *See generally* Guidelines § 3E1.1 Application Note 4. Further, even after his conviction Thompson maintained, *inter alia*, that he was not part of Bergerstock's overall operation despite the evidence of his relationship with several of Bergerstock's associates and their numerous discussions of price, quantity, quality, and inventory replenishment; he maintained that he was a minor participant despite evidence of his several hundred thousand dollars in sales; and notwithstanding the evidence at trial that on four occasions he obtained five or more pounds of marijuana from Bergerstock through Will, Thompson told the Probation Department that the largest quantity he had ever bought from Bergerstock was 2¼ pounds. We see no respect in which the district court could have concluded that Thompson accepted responsibility for his offenses.

■ Finally, we reject Thompson's contention that the district court erred in not sentencing him in accordance with an amendment to Guidelines § 2D1.1(b), which provides that a defendant who meets the five criteria set forth in § 5C1.2 and whose offense level is 26 or higher is entitled to a two-step decrease in offense level. Thompson was sentenced in January 1995; the amendment did not become effective until November 1995, *see* Guidelines Appendix C, Amendment 515. The district court properly sentenced him in accordance with the Guidelines in effect on the date of his sentencing.

*See* 18 U.S.C. § 3553(a)(4)(A); *United States v. Keller*, 58 F.3d 884, 889 (2d Cir.1995). In any event, the amendment would not have been applicable to Thompson, whose offense level was 24.

## CONCLUSION

We have considered all of Thompson's contentions on this appeal and have found in them no basis for reversal. The judgment of conviction is affirmed.