# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2868

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

BENJAMIN EGWAOJE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 655—**James B. Zagel**, *Judge.*

———————

ARGUED APRIL 18, 2003—DECIDED JULY 9, 2003

———————

Before EASTERBROOK, KANNE, and DIANE P. WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* On the morning of his trial for credit-card fraud, defendant Benjamin Egwaoje informed the district court that he no longer required the services of his attorney—his third since he had been indicted and the second to be appointed by the court—and that he wished to proceed *pro se*. After warning him about the dangers of self-representation, the district court reluctantly granted his request but asked that his former attorney remain to assist him as standby counsel. The district court also denied Egwaoje's request for a continuance (which he had argued was necessary in order for him to prepare to act as his own advocate) and the trial commenced as scheduled. At the

conclusion of his two-day trial, a jury found him guilty on both counts of the indictment. The court sentenced him to a twenty-seven-month prison term, to be followed by a three-year term of supervised release, and ordered him to pay $38,985 in restitution.

Egwaoje appeals his conviction and sentence arguing (1) that he did not make a knowing and intelligent waiver of his right to counsel; (2) that the district court abused its discretion in not granting his request for a continuance; (3) that his *pro se* representation resulted in a trial so lacking in fundamental fairness that he was denied due process of law; and (4) that the district court erred in refusing to consider his motion for downward departure at sentencing based on his status as a deportable alien. We reject all his arguments and affirm both his conviction and sentence.

## HISTORY

### The Crime

Egwaoje spent the summer months of 2001 visiting several Chicago-area banks, withdrawing thousands of dollars in cash by using credit cards that he had obtained through fraudulent means. It was a lucrative venture for Egwaoje; he swindled the target banks out of nearly $39,000. But while Egwaoje's summer may have been profitable, it was not endless. On July 17, 2001, a repeat visit to one particular bank location alerted a bank employee, who recognized Egwaoje but remembered him previously using a different name to withdraw funds. Her suspicions raised, the teller stalled Egwaoje and called the police, who promptly arrived to arrest him. The officers found Egwaoje to possess the fraudulently obtained credit card that he had tried to use to withdraw funds as well as fake identification cards in the name of the cardholder.

*Pretrial Proceedings*

Egwaoje retained attorney Gary Sternberg to represent him at his July 23, 2001 preliminary hearing in front of a magistrate. The magistrate judge found probable cause for his arrest, and a grand jury subsequently returned a two-count indictment against Egwaoje on August 15, 2001, charging credit-card fraud in violation of 18 U.S.C. § 1029 (a)(2) (use of unauthorized credit cards to obtain cash advances from different banks in an amount in excess of $1000) & (b)(1) (attempting to obtain a cash advance with an unauthorized credit card).

Months later, on November 5, 2001, Sternberg moved to withdraw from representing Egwaoje because his client had refused to meet with him and because of "substantial conflicts" between them. The district court granted Sternberg's motion and appointed Leonard Goodman, a member of the federal defender panel, to represent Egwaoje.

Egwaoje next appeared before the district court at a December 7, 2001 status hearing, where he personally addressed the court to demand a speedy trial. After asking the government to forecast the trial's length and complexity, the district court set the case for trial on January 28, 2002, telling Egwaoje he would receive the speedy trial that he had requested. Because Goodman had been unable to attend the status hearing (another attorney was filling in for him), the district court informed Egwaoje that the January 28 trial date might prove inconvenient for his newly appointed attorney and, if so, may have to be adjusted slightly; however, the court would not allow Goodman to move the date much. The district court explained that at the latest, it expected to be able to bring Egwaoje to trial sometime in February. Egwaoje okayed the proposed schedule.

The following week, the district court held a hearing to consider Egwaoje's motion for release on bond pending trial.

The court denied the motion. But Goodman attended the hearing and confirmed that he could accommodate a January 28 trial date. He also discussed the possibility that his client would plead guilty, but informed the court that he didn't have the discovery he needed to predict Egwaoje's criminal history category accurately, which prevented his client from making an informed plea decision. The court asked the parties to investigate the matter further and report back within a week.

The parties returned to court on December 21, 2001, and Egwaoje promptly renewed his speedy-trial requests. After the court had agreed to hold another status hearing in two weeks because Goodman still had yet to receive the information he needed, Egwaoje interrupted, stating "I don't want no time. I want a speedy trial. I say that before." The court tried to explain to Egwaoje that he needed more time so that he could make an informed plea decision:

> The truth of the matter is, if I told you, "You are going to trial tomorrow," which I couldn't because today is a Saturday, your attorney would, with good reason, not be ready. You would be convicted and there would be absolutely no point to proceeding that quickly. We have got to have some time to check into [Egwaoje's criminal history category] in order to make a good decision.

Egwaoje insisted, "I am ready for trial," to which the court reiterated that, in its opinion, he was not, and that Egwaoje would be unhappy with the outcome of an unduly hurried trial. Seeking clarification, Goodman asked whether the January 28 trial date would be rescheduled, and the court indicated that while the trial may not proceed on the 28th, it would still begin around that date.

Goodman's relationship with Egwaoje deteriorated in the following weeks. At the next status hearing on January 3, 2002, Goodman informed the court that the parties were at an impasse in plea negotiations and, as such, requested

that the case be scheduled for trial as soon as possible. The court reset the trial date for February 11, 2002. Egwaoje then addressed the court, "[Goodman] already told me he can't beat the case. He is not ready to go to trial." The court informed Egwaoje that his lawyer's comments did not reflect his unpreparedness for trial, but rather were an assessment of the strength of Egwaoje's case. Regardless of his lawyer's advice, the court clarified that the decision to proceed to trial or plead guilty lay entirely with Egwaoje.

Within a month, and five days before the scheduled start of trial, Goodman moved the court to withdraw from representing Egwaoje. Like he had done previously with Sternberg, Egwaoje was refusing to meet and cooperate with Goodman. The court asked Egwaoje whether he wanted a new lawyer or wished to proceed without one. Egwaoje replied with a nonsequitur about his reasons for failing to meet with Goodman and about his insistence that the case proceed to trial. In response to further questioning, Egwaoje told the court that he wanted another attorney. The court then allowed Goodman to withdraw and told Egwaoje that it would appoint him another attorney but that under the circumstances it would have to move the trial date to March 18 or March 25 at the latest. Once again Egwaoje objected, "I still want my speedy trial."

On February 26, 2002, Egwaoje's third attorney, Richard Halprin, appeared on his behalf at yet another status hearing. Halprin told the court that he had not had the chance to meet with Goodman to discuss Egwaoje's case but that, regardless, he could be ready for trial on March 25. He also promised to inform the court should any problems arise between him and Egwaoje. Later that day, the court set the trial date for March 25, but then subsequently reset the date for April 2, 2002.

*The Trial*

The morning of his scheduled trial date—after having spent approximately eight months in custody during which he repeatedly and consistently petitioned the court for a speedy trial—Egwaoje changed his tune and told the court he wanted a sixty-day continuance: he claimed not to know that his trial was set to begin that day, he wanted to fire Halprin, and he needed the additional time to prepare his defense. The court denied the request:

> No, I am not giving you sixty days. I have set the schedule. I have seen in you a course of conduct that has been nothing but an attempt to frustrate the government's effort to bring you to trial, to play games, to demand a speedy trial, and then to demand a continuance. This is your third lawyer.

Egwaoje then responded, "I am going to go *pro se*." The court told Egwaoje that if he so wished he could represent himself, but it would be a foolish decision:

> If you wish to proceed *pro se*, you are entitled to do so. The United States Constitution guarantees your right to proceed as your own lawyer. If you wish to proceed as your own lawyer, I am required to admonish you that to represent yourself in any criminal case is a foolish act. You will almost certainly make significant tactical errors. You will almost certainly put yourself in a position where even if you had a lawful defense, you would be unable to present it in a coherent way. On top of it, you will not, I think, adequately preserve the record in this case if error has been made. So I strongly advise you against representing yourself. But I do tell you that that is your decision. You may choose to represent yourself, or you may choose to have Mr. Halprin represent you. The choice is yours.

If Egwaoje chose to represent himself, the court continued,

it would request Halprin to remain in the courtroom to assist the defendant as standby counsel.

When Egwaoje replied by reducing the length of his original continuance demand to thirty days, the court informed him that regardless of his decision on whether to proceed *pro se*, his request for a continuance was going to be denied—his trial was starting that day. Egwaoje then denounced Halprin, telling the court he no longer had a lawyer and reiterating that he wished to proceed *pro se*. The court granted Egwaoje's request after once again informing him of his foolishness, and Halprin agreed to stay on as standby counsel. The court recessed for two hours so that Egwaoje could prepare his defense.

The evidence introduced against Egwaoje at trial included (1) the teller's testimony that Egwaoje had sought to receive cash advances from her under the names Grant Abbott, Hugh Ball, and Eugene Kientzy; (2) bank surveillance photos showing Egwaoje at the teller counters where he tried to get cash using those aliases; (3) the arresting officer's testimony regarding Egwaoje's final attempt and the materials recovered from him upon his arrest; and (4) the testimony of two of the victims whose identity Egwaoje had stolen.

During the course of the trial, Egwaoje didn't object to any evidence that the government offered, was repeatedly admonished by the court for asking irrelevant questions and making argumentative statements during cross-examination, and presented no witnesses or evidence in his own defense. The jury convicted Egwaoje on both counts.

### Post-trial Proceedings and Sentencing

Egwaoje filed a variety of *pro se* post-trial motions challenging his conviction, which the court treated as one

motion for a new trial. After hearing from Egwaoje in sup-
port of his motion, the court made extensive factual find-
ings. It concluded that Egwaoje (1) knew that his trial was
scheduled to begin on April 2; (2) understood that he had no
defense to the credit-card-fraud charges and so engaged in
a pattern of obfuscation and obstructionism in his pretrial
dealings with the court in an attempt to create an appeal-
able issue; (3) fully understood the risk of going to trial, but
lacking any defense, knowingly and intelligently waived his
right to counsel and resolved to represent himself in the
hope that he could personally invoke the jury's sympathy;
and (4) made errors in the course of his *pro se* representa-
tion, which was to be expected, but also reaped the benefit
of being able to argue his story to the jury without having
to testify and subject himself to the rigors of cross-examina-
tion. The court denied the motion.

At his sentencing hearing on July 12, 2002, Egwaoje
made a motion for downward departure based on his sta-
tus as a deportable alien. The district court determined
that the applicable guideline range was between twenty-one
and twenty-seven months and then sentenced Egwaoje to
the highest sentence within the range plus three-years su-
pervised release. It also ordered him to pay $38,985 in
restitution. After the prosecutor noticed that the court had
not announced its ruling on the downward-departure mo-
tion, the court stated, "The motion for downward departure
was considered and denied; largely because if there is any
ground for departure in this case, it is a ground for an up-
ward departure rather than a downward one."

## ANALYSIS

### I. Right to Counsel

Under the Sixth Amendment, a criminal defendant has a
constitutional right to waive the assistance of counsel and

to represent himself at trial. *Faretta v. California*, 422 U.S. 806, 819-20 (1975). To ensure that the right of self-representation is properly invoked—or, conversely, that the right to counsel is properly waived—the Supreme Court has cautioned that a defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." *Id.* at 835 (quotations omitted). At its broadest, this directive can be read to support a two-prong inquiry: Did the district court warn the defendant of these dangers? And did the defendant understand that warning?

To guide that inquiry this Court has considered "(1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself, (2) whether there is other evidence in the record that establishes that the defendant understood the disadvantages of self-representation, (3) the background and experience of the defendant, and (4) the context of the defendant's decision to proceed *pro se*." *United States v. Avery*, 208 F.3d 597, 601 (7th Cir. 2000) (citations omitted). This is not a formalistic, mechanical approach. Regardless of the consideration of these individual factors, our inquiry at all times is directed to the record as a whole and we ask whether that record supports a knowing and intelligent waiver. *Id.* If it does, we will uphold the district court's decision. *See United States v. Sandles*, 23 F.3d 1121, 1126 (7th Cir. 1994).

Egwaoje doesn't deny that he made an express statement to the court indicating his desire to proceed *pro se*. His principal contention on appeal is that the district court didn't do enough by way of a thorough and formal inquiry to ensure that his eyes weren't closed to the dangers of self-representation when he spoke. To ensure that his right was not waived blindly, Egwaoje would have us compare the in-

quiry the district court made in this case against the model inquiry laid out in the federal benchbook. Other courts of appeal have adopted this *Miranda*-style prophylactic approach, *see, e.g.*, *United States v. McDowell*, 814 F.2d 245, 249-50 (6th Cir. 1987); we have not, *United States v. Moya-Gomez*, 860 F.2d 706, 732-33 & n.25 (7th Cir. 1988), and we reaffirm that position here. Although we have observed that a judge who wishes to insulate his or her ruling from an inevitable appeal—whether that decision is to honor the *pro se* request or deny it—would be prudent to conduct a thorough and formal inquiry into the defendant's understanding of the court's warnings, our attention ultimately is directed not at what was said or not said to the defendant but whether that defendant in fact understood the risks and made a knowing and intelligent waiver. *Id.*; *see also United States v. Hill*, 252 F.3d 919, 928 (7th Cir. 2001) ("[T]he question is not whether the district judge used a check-off list but whether the defendant understood his options.").

Directing our inquiry to the totality of circumstances surrounding Egwaoje's purported waiver, we conclude it was made knowingly and intelligently. First, there is no question that the court satisfied its obligation to warn Egwaoje of the dangers of self-representation. The court told him it was a foolish act that was likely to result in significant errors at trial—errors that would be compounded by his failure properly to preserve the record for appeal. And there is nothing in the record that suggests that Egwaoje was incapable of understanding these repeated warnings.

Egwaoje's background and experience supports a finding of waiver. He was competent to stand trial. He graduated high school and attended two years of college. Moreover, for a time he successfully constructed and implemented a credit-card scheme that defrauded the target banks out of nearly $39,000. All these facts suggest that Egwaoje pos-

sessed normal intelligence and was capable of making in-formed—albeit unwise—decisions.

Egwaoje was no stranger to the criminal justice system either. His presentence investigation report outlines an extensive history of arrests and convictions for fraudulent schemes, which weighs in favor of finding a sufficient waiver. *See Moya-Gomez*, 860 F.2d at 736; *Hill*, 252 F.3d at 928. Egwaoje points out that this was his first trial and his first federal case. But a defendant's criminal history mili-tates in favor of waiver not only because we would expect that a criminally accomplished accused would possess some familiarity with courtroom procedures; it also bears upon the defendant's understanding of the risks involved and the nature of the charges brought against him. The fact that Egwaoje pleaded guilty to and served time for theft and for-gery charges resulting from prior false-identity and check-kiting schemes suggests that he was in a position to ap-preciate the seriousness of the charges brought against him in this case. And that appreciation for the danger of his sit-uation militates in favor of a knowing and intelligent waiver.

The strongest evidence supporting a finding of waiver, however, is that which suggests that Egwaoje was deliber-ately manipulating the system in an attempt to create an appealable issue. In ruling on his post-conviction motion for a new trial, the district court found as a matter of fact that Egwaoje engaged in a pattern of obfuscation and obstruc-tionism in his pretrial dealings with the court by repeatedly demanding a speedy trial and then requesting a continu-ance, by routinely dismissing his attorneys for no good rea-son, and by accusing—without basis—the district court and the prosecutor of bias. It further found that this conduct was Egwaoje's only practical defense to charges that were so well supported by the evidence as to be indefensible on their merits. These findings, entitled to deference on ap-

peal, support a conclusion that Egwaoje knew full well what he was doing when he asked to proceed *pro se. See Sandles*, 23 F.3d at 1129 ("[E]vidence of manipulation or intentional delay on the part of the defendant militates in favor of a knowing and intelligent waiver."); *see also United States v. Irorere*, 228 F.3d 816, 826 (7th Cir. 2000) ("[A] defendant may waive his right to counsel through his own contumacious conduct."); *United States v. Harris*, 2 F.3d 1452, 1455 (7th Cir. 1993) (finding that defendant waived right to counsel by firing fourth appointed attorney on the morning of trial when he was on notice that his fourth attorney would be the last the court would appoint for him); *United States v. Fazzini*, 871 F.2d 635, 642 (7th Cir. 1989) (finding implicit waiver after four court-appointed attorneys had been dismissed by the defendant or excused by the court). Given that we have found a defendant's behavior to evidence a knowing and intelligent choice in cases when the defendant never clearly stated that he intended to waive the right, *see, e.g., Fazzini*, 871 F.2d at 642, we surely are warranted in looking to Egwaoje's conduct to interpret the genuineness of his express request to proceed *pro se*. Doing so, we concur with the district court that Egwaoje fully understood the risk of going to trial without counsel.

Egwaoje's fallback position—that the district court erred in not concluding that he lacked the ability to conduct his trial effectively and thereby preclude him from the attempt—is meritless. In determining the intelligence and willfulness of a purported waiver, we distinguish between an individual's competency to waive representation (which is a relevant inquiry, as discussed above) and his competency to conduct it (which is not). *See Godinez v. Moran*, 509 U.S. 389, 399 (1993) ("[T]he competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself."). That is, we take precaution to ensure that a defendant who teeters on the precipice of self-rep-

resentation is aware that he risks falling into oblivion; we do not contemplate whether he can survive the fall.

In sum, we conclude that Egwaoje made a knowing and intelligent waiver of his right to counsel when he elected to represent himself at trial.


## II.  Right to a Fair Trial

Knowing that the Supreme Court has already foreclosed a defendant who elects to represent himself from pursuing an ineffective-assistance claim on appeal, *see Faretta*, 422 U.S. at 834 n.46 ("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'"), Egwaoje recasts what is essentially the same argument in the mold of a denial of his due process right to a fair trial, arguing that a readily apparent deficiency in performance at trial offends not only the defendant's rights but also undermines public confidence in the integrity of judicial proceedings.

Unfortunately for Egwaoje, we've already considered— and rejected—his argument. *See Moya-Gomez*, 860 F.2d at 741 (citing with approval and following the reasoning of *United States v. McDowell*, 814 F.2d 245, 251 (6th Cir. 1987), in which the Sixth Circuit rejected a fair-trial claim brought by a criminal defendant who had represented himself at trial). And if we were at all inclined to reconsider the issue, this case would not provide us with an appropriate opportunity. The errors cited by Egwaoje before this court do not amount to a constitutional violation. For example, Egwaoje cites his failure to make evidentiary objections as evidence of deficient performance; yet, he doesn't identify a single piece of evidence that was improperly admitted. Egwaoje's other errors—interrupting the court and wit-

nesses, asking irrelevant questions—are equally trivial. Nothing he said or did during the course of the proceedings was serious enough to justify a mistrial, *cf. Harris*, 2 F.3d at 1454, 1456 (finding no abuse of discretion in denying a motion for mistrial when defendant, in the presence of the jury, had climbed onto counsel's table to exclaim "Kill me!" and "Shoot me!", attempted to flee the courtroom, and made unsubstantiated claims that he was the victim of racial discrimination), and to the extent that his behavior drew the court to admonish him, he was warned repeatedly of that possibility.

Most damning to his fair-trial claim, however, would be Egwaoje's inability to show that the jury failed to determine his guilt fairly and reliably. *Cf. United States v. Farhad*, 190 F.3d 1097, 1105 (9th Cir. 1999) (defining a "fair trial" as a "proceeding that is designed to maximize the likelihood of a fair and reliable determination of guilt or innocence"). Given the overwhelming evidence implicating his guilt—which included the eye-witness testimony of the bank teller, the surveillance photos placing him at the scene, the arresting officer's testimony, and the credit cards and fake IDs recovered from Egwaoje upon his arrest—we fail to see how Egwaoje could argue that the jury's verdict was unreliable.

## III.   Denial of Continuance

Egwaoje's remaining claims—that the district court abused its discretion in denying his request for a continuance and that the district court failed to consider his departure motion—are also without merit and may be disposed of with minimal discussion.

A district court's exercise of its discretion in scheduling trials and granting or denying continuances is "almost standardless." *Moya-Gomez*, 860 F.2d at 742 (quoting

*United States v. Rodgers*, 755 F.2d 533, 539 (7th Cir. 1985));
*see also United States v. Davis*, 604 F.2d 474, 480 (7th Cir.
1979) (denial of continuances are "virtually unreviewable");
*cf. Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) ("[B]road dis-
cretion must be granted trial courts on matters of continu-
ances; only an unreasoning and arbitrary insistence upon
expeditiousness in the face of a justifiable request for delay
violates the right to the assistance of counsel." (quotation
omitted)).

In light of (1) the district court's finding that Egwaoje
knew his trial was scheduled to begin the morning of April
2; (2) Egwaoje's repeated requests that he be given a speedy
trial; (3) the fact that, despite those requests, the trial date
had already been rescheduled four times in large part be-
cause Egwaoje chose to fire his attorneys; (4) the unlikeli-
hood that any prejudice resulted from the denial given the
strength of the government's case and the lack of any viable
defense; (5) the relative simplicity of the charges brought
against him; (6) the fact that before trial Egwaoje chose not
to avail himself of the opportunity to access his discovery
materials through his attorneys; and (7) the inconvenience
and burden to the court, the government, and the witnesses
to reschedule a trial that was set to begin that day, it would
be beyond reason to find that the district court abused its
discretion in denying Egwaoje's request. *See United States
v. Farr*, 297 F.3d 651, 657 (7th Cir. 2002) ("[W]e refuse to
even consider, much less adopt, a rule that might suggest
that a trial court should tolerate a calculating and mischie-
vous defendant and grant indefinite continuances to a
defendant who refuses to cooperate with his attorney.");
*Avery*, 208 F.3d at 603 ("[T]he situation about which [the
defendant] now complains was brought about entirely by
his own actions. His decision to dismiss his lawyer on the
eve of trial and proceed *pro se* was a decision he made at
his own peril.").

*IV. Downward Departure Motion*

Relying upon *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997), Egwaoje filed a motion for downward departure at sentencing, arguing that his deportable alien status would result in an unusual or exceptional hardship in his conditions of confinement. The district court in a summary ruling stated that it "considered and denied" Egwaoje's motion. On appeal, Egwaoje argues that we cannot tell from this ruling whether the district court recognized it had the authority to depart, but declined in its discretion to do so, or whether it thought it lacked the authority to depart at all. Egwaoje argues that we must vacate his sentence and remand to the district court for more specific findings on his motion.

This court has often stated that "discretionary decisions not to depart are not reviewable." *United States v. Chavez-Chavez*, 213 F.3d 420, 421 (7th Cir. 2000) (citation omitted). As Egwaoje's motion points out, we stated in *Farouil* that in an appropriate case, a defendant may qualify for a departure based on his status as a deportable alien. 124 F.3d at 847. Such departures are reasonable because a deportable alien's conditions of imprisonment may be more severe, *see United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001), and because an alien must face the harsh consequences of deportation, *see United States v. Bautista*, 258 F.3d 602, 607 (7th Cir. 2002). We presume that district court judges know and understand the law, and we will not disturb that presumption by mere inference. *See United States v. Kezerle*, 99 F.3d 867, 870 (7th Cir. 1996).

Here, the district court's ruling may have been brief, but it was clear. The court stated that it "considered" Egwaoje's motion before denying it. We will take that language at face value to mean that the court recognized the *Farouil-Guzman-Bautista* line of cases granting it authority to depart, but that in considering Egwaoje's specific request, it declined to exercise its discretion to do so. Hence, we lack

the jurisdiction to consider the exercise of this discretion on appeal.

## CONCLUSION

For the foregoing reasons, we AFFIRM both Egwaoje's conviction and sentence.


A true Copy:

       Teste:


                _____
                *Clerk of the United States Court of*
                *Appeals for the Seventh Circuit*