In the

# United States Court of Appeals
### For the Seventh Circuit

No. 06-2381

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID H. ENGLAND,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois.
No. 04 CR 50068—**Philip G. Reinhard**, *Judge.*

ARGUED SEPTEMBER 24, 2007—DECIDED NOVEMBER 7, 2007

Before POSNER, FLAUM and WOOD, *Circuit Judges.*

FLAUM, *Circuit Judge.* On September 15, 2004, defendant-appellant David England, a convicted felon, smashed his neighbor's car window with the butt of a gun and then discharged the gun into the air. England was soon arrested and, while in prison, he campaigned over the prison phone to get his sister, brother-in-law and father to hide evidence and create an alibi for him. When he learned that his brother-in-law was instead cooperating in the investigation, he made threats to kill him.

For his efforts, a grand jury returned a four-count indictment. The indictment charged one count of unlawful possession of a firearm by a felon under 18 U.S.C. § 922(g),

two counts of witness tampering in violation of 18 U.S.C. § 1512(b), and one count of threatening physical force with the intent to prevent the testimony of a witness in violation of 18 U.S.C. § 1512(a)(2)(A). At trial, England proceeded without counsel and, on January 6, 2006, a jury convicted him of all counts. The district court then sentenced England to 262 months imprisonment.

England now appeals, challenging the sufficiency of the evidence underlying his conviction for the threats, the voluntariness of his decision to represent himself, and the reasonableness of his sentence. For the reasons set out below, we affirm his conviction and the district court's finding of a voluntary waiver of his right to counsel. However, because the district court did not consider the potential disparity that may arise from England's sentence, we vacate his sentence and remand for resentencing.

## I. Background

On September 15, 2004, defendant-appellant David England was investigating a recently broken window in his mother's home. He had confronted four neighbors about the incident and tried to get one to admit to breaking the window. When his efforts to elicit a confession failed, he evened the score by shattering two car windows in a nearby car and firing a gun into the air. One of the onlookers notified the police and, a week later, the police apprehended England at a gas station where he had stopped to refuel. The police opted not to impound the car he was driving—his mother's Pontiac Grand Am— and it remained parked at the gas station. Based on the onlookers' statements, a grand jury indicted England for being a felon in possession of a firearm.

While in custody, England called his sister, Dawn Bull, regarding the Grand Am. He asked his sister to move the

car to his grandmother's house and "put a tarp over it." Later that day and again on September 25, he called his brother-in-law, Robert Bull, inquiring as to the whereabouts of the car and telling Bull not to let anyone use it. On September 26, after moving the car, England's sister and mother found a blue duffle bag in the engine compartment. Concerned about the contents of the bag, they flagged down a police officer who removed it and found a bloodied gun inside. The police conducted DNA analysis on the recovered blood and matched the sample to England.

News of the gun's recovery did not sit well with England; he immediately grew concerned that his sister and mother were cooperating with the police. On September 27, he called his brother-in-law and told him to make sure that his sister and his mother "don't get out o' hand" and told him to "control them women." Later, on November 1, he also asked his sister to corroborate his alibi, saying that he did not "understand why a . . . couple of my family members can't . . . recognize they were up there at Barnes and Noble that particular day, and they seen me up there." Dawn refused.

On December 15, England learned that his brother-in-law had been cooperating with the police and he boiled over. He could not call his brother-in-law directly as Bull had blocked all calls coming from the prison. So England called his father instead. He told his father that he would "put some bullets in somebody's head" and asked his father to "talk with [Bull] man to man." On December 27, he went further, asking his father to "go relay a message to Robert" that if he "shows up to court, when I walk outta prison in fifteen years, I'm 'onna fuckin' murder his motherfuckin' ass." At trial, England's father would testify that he never relayed these threats to Bull. In fact, Bull would not learn of England's statements until the government alerted him later in the investiga-

tion. Nonetheless, based on these threats and England's efforts to procure an alibi, on March 1, 2005, a grand jury issued a superseding indictment, tacking on two counts of witness tampering and one count of threatening a witness.

During his initial appearance for the felon-in-possession charge, the court appointed England an attorney, Paul Flynn. During England's continued detention hearing on February 8, Flynn advised the magistrate judge that England wanted to represent himself, despite Flynn's advice to the contrary. Near the end of the hearing, the magistrate questioned England extensively on his decision to represent himself. During the colloquy, England stated that he had studied the law off and on for several years and had helped with his prior criminal trials. He said that he was familiar with the Federal Rules of Evidence and Criminal Procedure and knew that the judge would not assist him during the trial. Finally, England said that he understood the evidence that the government would offer and, despite the magistrate's opinion that he would be better served by a lawyer, he wanted to represent himself. When Flynn expressed his concern that England only wanted to represent himself to move to a separate prison, the magistrate inquired further and clarified that self-representation would not impact his location. Satisfied by England's responses and convinced that the waiver was voluntary, the magistrate permitted England to proceed pro se with Flynn as standby counsel.

The next week, on February 14, the district court held another pre-trial proceeding to determine whether England had knowingly and voluntarily waived his right to counsel. The court expanded upon the magistrate's questioning, including an inquiry into England's personal history; his education and family background; various aspects of the trial such as the marshaling of evidence and the function of opening statements; and England's famil-

iarity with the charges and potential sentencing issues that could arise. The district court also concluded that England would be better off with an attorney and so informed England. Following the questioning, England remained convinced that he wanted to represent himself. The extensive questioning satisfied the court that England's waiver was voluntary, and the court allowed him to proceed pro se. After England claimed that he was having problems with Flynn, the court appointed new full-time counsel, Dennis Ryan. On December 29, 2005, England again requested to represent himself and, after determining that this was done knowingly and voluntarily, the court complied, appointing Ryan as standby counsel. The case went to trial on January 3, 2006. On January 6, the jury convicted England on all counts.

At sentencing, the court requested briefing on the appropriate Guidelines section to apply to Count IV—threatening physical force with the intent to prevent the testimony of a witness. The government and the presentence investigation report initially stated that U.S.S.G. § 2A2.1(a)(1) was appropriate. This section covers "Assault with Intent to Commit Murder; Attempted Murder" and has a base offense level of 33. The court, however, directed both parties to brief whether U.S.S.G. § 2.J1.2 might be more appropriate. This section covers "Obstruction of Justice" and would result in an offense level of 22.[1] The court ultimately ruled that § 2A2.1 was appropriate. In so doing, the court first looked to the statutory index in Appendix A and located 18 U.S.C. § 1512(a). The Appendix indicated that § 1512(a) applied to four separate Guidelines sections. The court reasoned

---

[1] The base offense level set out in 2J1.2(a) is 14, with 8 levels added by 2J1.2(b)(1)(A) "[i]f the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice."

that "Assault with Intent to Commit Murder; Attempted Murder" was the most germane and stated that it had to "apply the offense guidelines referenced in the statutory index to the statute of conviction unless the case falls within the limited stipulation exception," which was inapplicable. Although the court found it "somewhat difficult in this case," it applied § 2A2.1 and set the base offense level at 33. The court declined to lower the sentence under 18 U.S.C. § 3553(a) and sentenced England to 262 months. This appeal followed.

## II. Discussion

### A. *Waiver of Right to Counsel*

England argues that he did not knowingly and voluntarily waive his right to counsel. The right to represent oneself is "necessarily implied by the structure" of the Sixth Amendment. *Faretta v. California*, 422 U.S. 806, 819 (1975). Although one can certainly question the wisdom of self-representation, the right has a worthy pedigree; a defendant's freedom to raise his own voice in his defense comes from the notion that some measure of individual autonomy prevents a court from forcing an attorney upon the defendant. *Id.* However lofty this ideal may be, courts cannot rubber-stamp a defendant's invocation of his right to self-representation. The district court must make the defendant "aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Id.* at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)).

To that end, this Court has established a four-part test that examines: (1) whether and to what extent the district court conducted a formal hearing into the defendant's decision to represent himself; (2) other evidence in

the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to waive his right to counsel. *United States v. Todd*, 424 F.3d 525, 530 (7th Cir. 2005). This Court reviews the district court's finding of voluntary waiver for an abuse of discretion, *Todd*, 424 F.3d at 530 n. 1, and we will not overturn the district court's decision "unless it would result in fundamental unfairness impinging on due process rights," *United States v. Irorere*, 228 F.3d 816, 827 (7th Cir. 2000) (quoting *Maclin v. Freake*, 650 F.2d 885, 886 (7th Cir. 1981)). Based on our review of the questions posed by the magistrate and district court, we agree that England's waiver was knowing and voluntary.

As to the first factor, both the magistrate and the district court adequately informed England of exactly what he was waiving. A court does not have to give the defendant a crash course in criminal law or trial procedure before a defendant's waiver of his right to counsel will be voluntary. *See Todd*, 424 F.3d at 531. However, the "failure to inform [a defendant] of the dangers and disadvantages of self-representation weighs against a finding of a knowing or intelligent waiver." *United States v. Bell*, 901 F.2d 574, 578 (7th Cir. 1990). On two occasions during the pretrial proceedings—before the magistrate and again before the district court—England received warnings about the pitfalls of self-representation. The magistrate's questioning tracked most, if not all, of the questions contained in the Federal Judicial Center's Benchbook for U.S. District Court Judges. The magistrate specifically probed England's familiarity with the Federal Rules of Evidence and Criminal Procedure, the nature of the charges against him, and the law more generally. In addition, the magistrate informed him that he would be better served by professional counsel and retained Flynn

as standby counsel. Although strict adherence to the Benchbook is not required and rote adherence not desired, *United States v. Egwaoje*, 335 F.3d 579, 585 (7th Cir. 2003), the magistrate's questioning meaningfully touched upon all the pitfalls of self-representation set out in the Benchbook. Six days later, the district court questioned England again and went even further, discussing matters ranging from the purpose of the opening statement to his reasons for forgoing representation, possible strategies for cross-examination, and the government's burden of proof. The district court's initial investigation—spanning thirty-three pages of transcript—provides an impressive illustration of a formal inquiry into a defendant's waiver of his right to counsel. These two wide-ranging discussions of the effects of waiver nearly a year before trial were clearly sufficient to inform England of the consequences of his decision.

Turning to the second factor, other evidence indicates that England understood the consequences of his waiver. In analyzing this factor, this Court has credited statements by the defendant regarding his own legal disability and explanations by standby counsel of the pitfalls of self-representation. *United States v. Sandles*, 23 F.3d 1121, 1128 (7th Cir. 1994). At the initial hearing before the magistrate, England's then-attorney said that he had tried to talk England out of his decision, but England would not listen. *See United States v. Moya-Gomez*, 860 F.2d 706, 735-36 (7th Cir. 1988) (crediting statements by standby counsel in finding voluntary waiver). Before the district court, England recognized his own legal inability and said that he would do "about the same [as an attorney], or I guess I'll have to take my chances." *See Moya-Gomez*, 860 F.3d at 735 (crediting awareness of legal disability in finding waiver). In addition, after his own advocacy failed to gain an acquittal, England handed the reins over to his standby counsel during sentencing,

saying that he did not know what he was doing. That England recognized the risk of self-representation, after being informed that he had made an unwise decision by his acting attorney, provides other evidence that England was aware of the consequences of waiver.

As to the third factor, England's background and experience would also tend to support a finding of knowing and voluntary waiver. This Court examines the background and experience of the defendant merely to gauge whether he appreciated the gravity of his waiver, not in the hopes of finding adequate legal training. *See Faretta*, 422 U.S. at 835 (stating that "a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation"); *Egwaoje*, 335 F.3d at 585-86. England's background indicated that he proceeded with his eyes open. He had the equivalent of a high school education and had thirty-six credits at a community college. A doctor determined that he was competent to stand trial and did not have any mental health issues that would interfere with his ability to understand waiver. England also had been in court several times before for his state criminal charges. Granted this was England's first time in federal court and he had not represented himself in his earlier proceedings. However, his prior involvement with the criminal justice system apprised him of the "seriousness of the charges brought against him." *Egwaoje*, 335 F.3d at 586.

Finally, the context of England's decision indicates that it was knowing and voluntary. A waiver is likely knowing and voluntary if the defendant gave it for strategic reasons or after repeatedly rejecting the assistance of counsel. *Egwaoje*, 335 F.3d at 586. England's behavior at trial caused unnecessary delay and duplicated the proceedings. On February 8 and 14, 2005, England said that he wanted to represent himself and the court appointed

Flynn as stand-by counsel. In June, he complained of medical problems but refused to cooperate with the doctors. On July 1, 2005, the government moved to replace Flynn as stand-by counsel after England accused Flynn of working for the prosecution. When the court subsequently appointed Ryan as stand-by counsel, little improved. England refused to cooperate or even meet with Ryan. At one point, England even spat in Ryan's face in open court. England's behavior at trial seemed calculated to delay and complicate the proceedings whenever possible. Self-representation gave him the opportunity to do this. In light of his behavior at trial, his decision to forgo counsel was rooted in strategy and, accordingly, this factor favors a finding of voluntary waiver.

For the foregoing reasons, England's waiver of his right to counsel was knowing and voluntary. Each factor supports a finding of voluntariness; the evidence of voluntariness is overwhelming. Accordingly, we affirm the district court's finding of waiver.

### B.  Sufficiency of the Evidence

England also argues that the evidence was insufficient to support his conviction for witness tampering under 18 U.S.C. § 1512(a)(2)(A). A challenge based on the insufficiency of the evidence is a tall order, *United States v. Johnson*, 903 F.2d 1084, 1086 (7th Cir. 1990), and the standard governing such challenges is familiar: This Court must affirm a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *United States v. Troop*, 890 F.2d 1393, 1397 (7th Cir. 1989)) (emphasis omitted). In other words, an appeal does not deputize this Court as the ultimate trier of fact.

Section 1512(a)(2)(A) punishes whoever "uses physical force or the threat of physical force against any person . . .

with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding." 18 U.S.C. § 1512(a)(2)(A). To sustain a conviction under § 1512(a)(2)(A), the government must show that (1) England used the threat of physical force; (2) with the intent of curtailing his brother-in-law's involvement in his prosecution. On appeal, the issue before this Court is a narrow one. England rightly does not deny expressing a desire to kill his brother-in-law for cooperating; the recorded conversations with his father over the prison phone prove as much. Instead, England argues that his statements to his father cannot support the weight of his conviction because his father never relayed the threats to his brother-in-law. A threatening statement that the intended recipient does not receive, England argues, is not the "use of . . . [a] threat" for purposes of § 1512(a)(2)(A). We disagree.

The statute itself does not define what it means to "use[ ] . . . the threat of physical force." However, the plain meaning of the phrase does not require that the would-be victim learn of the threat. The verb "use" in § 1512(a)(2) is roughly akin to "employ" and means to "to put into action or service." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2523 (1981); *see also* BLACK'S LAW DICTIONARY 1541 (6th ed. 1990) (defining "use" as "to convert to one's services"). And a "threat" is "an expression of intention to inflict evil, injury, or damage on another." WEBSTER'S THIRD, *supra*, at 2382; BLACK'S, *supra*, at 1480 (defining "threat" as a "communicated intent to inflict physical or other harm on any person or on property"). When read together, the statute prohibits expressing an intent to inflict injury on another through physical force.[2] An

---

[2] "Putting an expression into action or service" means simply "expressing." *See* WEBSTER'S THIRD, *supra*, at 802 (defining
(continued...)

"expression" only requires that *someone*—not necessarily the intended victim—perceive it. Adding a requirement that the would-be victim himself actually perceive the threat would graft on an additional "receipt" element that the statute's text does not require. *See United States v. Geisler*, 143 F.3d 1070, 1071-72 (7th Cir. 1998) (rejecting a "receipt" requirement under 18 U.S.C. § 876, which prohibits depositing threatening communications in the mail); *see also Johnson*, 903 F.2d at 1088 n.5 (stating that under § 1512 "the focus is on the endeavor to bring about the proscribed result, rather than on the success of the endeavor"). We have not read an analogous requirement into other statutes prohibiting threats. *See United States v. Fuller*, 387 F.3d 643, 646-47 (7th Cir. 2004) (18 U.S.C. § 871); *Geisler*, 143 F.3d at 1071-71 (18 U.S.C. § 876). Accordingly, we decline to do so under § 1512(a)(2)(A).

To avoid this result, England argues that, because the threat never actually made it to his brother-in-law, his statements did not have a "reasonable tendency to intimidate," citing the standard articulated by this Court in *United States v. De Stefano*, 476 F.2d 324 (7th Cir. 1973). However, this argument misreads *De Stefano*. The relevant issue in that case was whether a none too subtle "question" that the defendant posed to a witness in an elevator—"Have you done any fishing lately?"—constituted a threat under 18 U.S.C. § 1503. *Id.* at 327, 330. The Court articulated an objective standard for evaluating whether a statement constitutes a threat, concluding that the relevant inquiry is whether the statement has

---

[2] (...continued)
"express" as "to represent in words" and "expression" as "an act, process, or instance of representing, manifesting or conveying in words or some other medium").

a "reasonable tendency to intimidate." *Id.* at 330. This standard governs the contents of the threat; that is, whether the defendant's statement is actually "an expression of intention to inflict evil, injury, or damage." This objective reasonableness standard ensures that only "true threats" go punished. *See Watts v. United States*, 394 U.S. 705, 707 (1969); *United States v. Stewart*, 411 F.3d 825, 828 (7th Cir. 2005) (stating that a "true threat" consists of a statement made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates a statement as" a threat (quoting *United States v. Khorrami*, 895 F.2d 1186, 1191 (7th Cir. 1990)). It does not provide a yardstick for measuring the likelihood that the statement would either reach or subjectively affect the intended recipient.

Nonetheless, the fact that the intended target never received the threat is still relevant under § 1512(a)(2)(A). The proximity of the person who hears the threat to the ultimate target of the threat is evidence of the speaker's "intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding." *Cf. United States v. Spring*, 305 F.3d 276, 281 (4th Cir. 2002) (stating that "whether a threat was communicated to the victim may affect whether the threat could reasonably be perceived as an expression of genuine intent to inflict injury"). As the link between an expression of an intent to inflict injury and the participant in an official proceeding grows more attenuated, so too does the inference that the speaker intended to "influence, delay, or prevent" testimony in an official proceeding. In this case, no such attenuation exists. England could not reach his brother-in-law because he had blocked calls from the prison phone. His next best option was to convey the threats to his father with instructions to pass them along. Although it was not inevitable that his father would relay the threat,

it was not irrational to think that England intended to influence his brother-in-law. Because rationality is the relevant inquiry, sufficient evidence supported England's conviction under § 1512(a)(2)(A).

### C.  Reasonableness of England's Sentence

Finally, England challenges the reasonableness of his sentence. In calculating England's sentence, the district court first looked to the statutory index of the Guidelines and found the Guidelines sections corresponding to 18 U.S.C. § 1512(a). Pursuant to this Court's holding in *United States v. Lanas*, 324 F.3d 894 (7th Cir. 2003), the district court concluded that the most germane Guidelines section was U.S.S.G. § 2A2.1, which punishes "Assault with Intent to Commit Murder; Attempted Murder." In so doing, the court rejected England's argument that it should apply U.S.S.G. § 2J1.2, which governs "Obstruction of Justice," but which the Guidelines do not link to § 1512(a). After grouping the four counts, the district court calculated England's sentencing range using the base offense level for attempted murder, carrying an offense level of 33. Finally, the court declined to vary the sentence based on the factors listed in 18 U.S.C. § 3553(a).

The issue on appeal is straightforward: England threatened to kill his brother yet the Sentencing Guidelines point to a sentence for attempted murder. The difference between the two is not negligible; attempted murder carries a base offense level of 33 whereas threats of physical injury to obstruct justice carry a base offense level of 22. *See* U.S. SENTENCING GUIDELINES MANUAL §§ 2A2.1, 2J1.2 (2005). England's ultimate sentence was 262 months in prison, which, on appeal, England claims is an unreasonable one. However, we do not find it necessary to reach the reasonableness of England's sentence. The record on appeal lacks any indication that the district court considered "the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Because the record is inadequate to evaluate the district court's use of its discretion, we vacate England's sentence and remand for resentencing.

As a preliminary matter, the district court properly declined to apply U.S.S.G. § 2J1.2. Prior to the 2000 Amendments to the Sentencing Guidelines, the district court would have been free to choose a section not listed in the statutory index in arriving at the appropriate base offense level, "provided the charged conduct fit more closely within the other guideline." *Lanas*, 324 F.3d at 904. However, the 2000 Amendments deleted this "heartland" provision. Rather than tinker with the Guidelines sections listed in the statutory index, the district court must typically begin with "the offense guideline referenced in the Statutory Index for the statute of conviction." *See United States v. Gracia*, 272 F.3d 866, 876 (7th Cir. 2001) (quoting U.S. SENTENCING GUIDELINES MANUAL app. C. supp., amend. 591, at 32 (2000)); *see also United States v. Kosmel*, 272 F.3d 501, 507 (7th Cir. 2001) (discussing effect of Amendment 591 on "heartland" analysis). As long as the ultimate sentence is reasonable, the district court can vary from the sentence identified in the Guidelines based on its discretion under § 3553(a). *See United States v. Vitrano*, 495 F.3d 387, 391-92 (7th Cir. 2007).

In denying the defendant's request for a variance, the district court did not actively consider 18 U.S.C. § 3553(a)(6) and the sentence disparity that may arise from England's sentence. In a post-*Booker* world, the district court enjoys considerable discretion when imposing a sentence. The present sentencing regime consists of a nearly exhaustive set of rules set out in the Guidelines that is moderated by judicial discretion and the reasonableness standard. Illustrative of this discretion are the

considerations set out in 18 U.S.C. § 3553(a); the result dictated by the rigid calculus in the Guidelines must first pass through the discretion conferred by these factors before a sentence becomes final. *See United States v. Cunningham*, 429 F.3d 673, 676 (2005).

In the case at hand, the court gave no indication that it considered the disparity that may arise from England's sentence when it discussed a variance under § 3553(a) even though the defendant pointed to the factual dissimilarity between his threat and the applicable Guidelines section. Elsewhere, the court expressed its concern over the potential injustice that might occur. The district court stated that it found the use of the Guidelines section for attempted murder "somewhat difficult in this case." In addition, the court requested briefing on whether to apply § 2A2.1 or § 2J1.2 to England's conduct. Despite these concerns and the fact that the typical threat called for a markedly different sentence, the district court did not discuss the potential disparity as part of its § 3553(a) analysis.

This discretion is all the more important where, as here, it appears that the Sentencing Guidelines might have a fairly pernicious scrivener's error. The error results from a recent amendment that Congress made to the witness tampering statute. In 2002, Congress amended 18 U.S.C. § 1512 and created the current § 1512(a)(2). Before the 2002 changes, § 1512(a) only punished "[w]hoever kill[ed] or attempt[ed] to kill another person, with intent to" affect his cooperation in an official proceeding. 18 U.S.C. § 1512(a) (2000). At the time, the Sentencing Guidelines statutory index mapped these offenses to four sections of the Guidelines: first- and second-degree murder, voluntary manslaughter, and § 2A1.1, which governs "Assault with Intent to Commit Murder; Attempted Murder." U.S. SENTENCING GUIDELINES MANUAL app. A, at 459 (2001). Given what § 1512(a) punished at the time, this made

sense. A person either "kill[ed]" the person involved in an official proceeding (through first- or second-degree murder or voluntary manslaughter) or "attempt[ed] to kill" him. The statutory index punished accordingly.

Similarly, before the 2002 changes, § 1512(b) punished "[w]hoever knowingly use[d] intimidation or physical force, threaten[ed], or corruptly persuade[d] another person, . . . or engage[d] in misleading conduct toward another person" involved in an official proceeding. 18 U.S.C. § 1512(b) (2000). The statutory index mapped these offenses to three Guidelines sections: attempted murder, aggravated assault, and § 2J1.2, which governs "Obstruction of Justice." U.S. SENTENCING GUIDELINES MANUAL app. A, at 459 (2001). This also made sense. A defendant either used physical force meaning to kill the witness but fell short (committing attempted murder); used physical force meaning only to harm the witness and succeeded (committing aggravated assault); or threatened, intimidated or otherwise "corruptly persuaded" the witness (and obstructing justice).

In 2002, Congress rearranged the witness tampering statute and added a new § 1512(a)(2). Pub. L. No. 107-273, at 1803-04 (2002). The bill was entitled "Increasing the Penalty for Using Physical Force to Tamper with Witnesses, Victims, or Informants" and it produced the current § 1512. *Id.* Section 1512(a)(2) now punishes "[w]hoever uses physical force or the threat of physical force against any person, or attempts to do so." 18 U.S.C. § 1512(a)(2) (2006). The 2002 amendment also added a ten-year statutory maximum for threats under the modified § 1512(a)(2) and struck "physical force" from § 1512(b). Pub. L. No. 107-273, at 1804. Section 1512(b) now only punishes intimidation, threats, corrupt persuasion and misleading conduct. 18 U.S.C. § 1512(b) (2006).

However, the relevant portions of the statutory index to the Sentencing Guidelines remained exactly the same.

*See* U.S. SENTENCING GUIDELINES MANUAL app. A, at 525 (2005). As a result, the Guidelines sections that correspond to § 1512(a) do not include "Obstruction of Justice," even though a threat of physical force against a witness would appear to fall within this category. Similarly, although no crime involving physical violence exists in § 1512(b), the statutory index continues to reference second-degree murder and aggravated assault. Most notably, the statutory maximum for threats under § 1512(a) is ten years, but the *minimum* Guidelines sentence for murder threats under § 1512(a) is over eleven years. *Compare* U.S. SENTENCING GUIDELINES MANUAL ch. 5, part A (2005) (setting minimum sentence for defendant with no prior criminal history and base offense level of 33 at 135-168 months in prison) *with* 18 U.S.C. § 1512(a)(3)(C) (2006) (providing as punishment "in the case of the threat of use of physical force against any person, imprisonment for not more than 10 years").

All of this points to a potential scrivener's error in the statutory index. If a mistake exists, remedying it falls within the purview of the Sentencing Commission, not this Court. However, given the discretion that the district court has in imposing a sentence, the potential disparity that may arise from sentencing a threat as though it was an attempted murder would be a basis for a variance. Because the district court did not explain its view on the potential disparity, we vacate England's sentence and remand for resentencing. However, we express no opinion as to the appropriate sentence.

### III.  Conclusion

For the reason's stated herein, we AFFIRM England's conviction and VACATE his sentence and REMAND for resentencing.

No. 06-2381                                                                    19

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*